IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

YESENIA G., )
)
        Plaintiff, )
)
v. ) 1:23CV308
)
MARTIN J. O'MALLEY,[1] )
Commissioner of Social Security, )
)
        Defendant. )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Yesenia G. ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for Disability Insurance Benefits under Title II of the Act and her claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.    PROCEDURAL HISTORY

Plaintiff protectively filed applications her Title II applications on February 11, 2020 and her Title XVI application on January 22, 2020. (Tr. at 19, 567-84.)[2] In both applications,

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #5].

she alleged disability beginning June 28, 2019, the day after a previous disability claim was denied. (Tr. at 19, 21, 173.) Plaintiff's applications were denied initially (Tr. at 197-231, 359-69) and upon reconsideration (Tr. at 235-54, 275-94, 374-83). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 405-17.) On April 21, 2022, Plaintiff, along with her attorney, attended the subsequent telephonic hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 19.) Following this hearing, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act (Tr. at 37), and on February 9, 2023, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 4-9).

II. <u>LEGAL STANDARD</u>

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." <u>Hines v. Barnhart</u>, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." <u>Frady v. Harris</u>, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." <u>Hancock v. Astrue</u>, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Hunter v. Sullivan</u>, 993 F.2d 31, 34 (4th Cir. 1993) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 390 (1971)). "It consists of more than a mere

scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[3]

---

[3] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[4] Step four then requires the ALJ to assess whether, based on

---

determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

[4] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after

4

that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her alleged onset date. The ALJ therefore concluded that Plaintiff met her burden at step one of the sequential evaluation process. (Tr. at 24.) At step two, the ALJ further determined that Plaintiff had the following severe impairments:

> migraines; obstructive sleep apnea; degenerative disc disease; depression; mild intellectual disability; and cellulitis[.]

(Tr. at 24.) The ALJ determined at step three that none of the impairments identified at step two, individually or in combination, met or equaled a disability listing. (Tr. at 25-27.) He

---

[the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

5

therefore assessed Plaintiff's RFC and determined that Plaintiff could perform light work with the following, non-exertional limitations:

> [Plaintiff is capable of] sitting for 6 hours with the need to alternate to standing for 5 to 10 minutes after every 1 hour of sitting; standing for 6 hours with the need to alternate to sitting for 5 to 10 minutes after every 1 hour of standing; and walking for 6 hours with the need to alternate to sitting for 5 to 10 minutes after every 1 hour of walking. She has frequent ability to reach overhead bilaterally. She can occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. She can occasionally balance and stoop, but never kneel, crouch or crawl. [Plaintiff] can never be exposed to unprotected heights, moving mechanical parts, or vibration. [Her] ability to understand, remember, and carry out instructions could be accommodated by the performance of simple, routine, repetitive tasks done not at a production rate pace (e.g. assembly line work). She is able to perform simple work-related decisions in the exercise of her judgment. She is able to interact and respond appropriately with supervisors, coworkers, and the public on an occasional basis. She is able to make simple work-related decisions in dealing with changes in the work setting. [Plaintiff's] time off-task would be accommodated by the performance of simple, routine, repetitive tasks.

(Tr. at 27-28.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff's past relevant work exceeded her RFC. (Tr. at 35.) However, the ALJ found at step five that, given Plaintiff's age, education, work experience, RFC, and the testimony of the vocational expert as to these factors, she could perform other jobs available in significant numbers in the national economy. (Tr. at 35-36.) The ALJ therefore concluded that Plaintiff was not disabled under the Act. (Tr. at 37.)

Plaintiff now raises two challenges to the ALJ's RFC assessment. First, she contends that the ALJ failed to "account for the vocationally limiting effects of Plaintiff's chronic migraines in the [RFC.]" (Pl.'s Br. [Doc. #12] at 1, 5-11.) Second, Plaintiff argues that the ALJ failed to "perform a proper function-by-function evaluations of Plaintiff's ability to

6

handle and finger with the non-dominant left upper extremity." (Pl.'s Br. at 1, 12-16.) After a thorough review of the record, the Court finds no basis for remand.

A. Migraines

Plaintiff first argues that, in assessing her RFC, the ALJ failed to include any RFC restrictions to account for the limiting effects of Plaintiff's frequent migraine headaches or, in the alternative, explain the absence of such restrictions. Plaintiff contends that she presented ample evidence of her ongoing migraine symptoms during the time period at issue, including light sensitivity, intractable pain, and extended recovery times. The ALJ included migraines among Plaintiff's severe impairments at step two of the sequential analysis, but Plaintiff contends that the RFC contains no limitations specifically addressing headaches or their effect on Plaintiff's ability to work.

Plaintiff argues that the ALJ erred in finding Plaintiff's statements regarding the limiting effects of her headaches less than fully consistent with the medical evidence and other evidence of record. Under the applicable regulations, the ALJ's decision must "contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Social Security Ruling 16-3p, Titles II and XVI: Evaluation of Symptoms in Disability Claims, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"); see also 20 C.F.R. § 404.1529. Moreover, in Arakas v. Commissioner of Social Security, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit clarified the procedure an ALJ must follow when assessing a claimant's statements:

> When evaluating a claimant's symptoms, ALJs must use the two-step framework set forth in 20 C.F.R. § 404.1529 and SSR 16-3p, 2016 WL 1119029

7

(Mar. 16, 2016). First, the ALJ must determine whether objective medical evidence presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3.

Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether the claimant is disabled. See 20 C.F.R. § 404.1529(c); SSR 16-3p, 2016 WL 1119029, at *4. At this step, objective evidence is *not* required to find the claimant disabled. SSR 16-3p, 2016 WL 1119029, at *4–5. SSR 16-3p recognizes that "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques." Id. at *4. Thus, the ALJ must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate" them. Id. at *5.

Arakas, 983 F.3d at 95. Thus, the second part of the test requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects [her] ability to work." Craig, 76 F.3d at 595. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 416.929(c)(3) and 20 C.F.R. § 404.1529(c)(3):

(i) [Plaintiff's] daily activities;
(ii) The location, duration, frequency, and intensity of [plaintiff's] pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
(v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
(vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

In the present case, contrary to Plaintiff's assertions, the ALJ provided more than conclusory statements discounting Plaintiff's testimony. As instructed by the regulations, the ALJ considered the entire case record and explained his reasons for deviating from Plaintiff's statements regarding the impact of her symptoms on her ability to work. This explanation was provided throughout the ALJ's RFC discussion. For example, the ALJ considered Plaintiff's treatment records regarding her headaches at great length. The ALJ noted that Plaintiff sought treatment for her migraines on multiple occasions throughout the time period at issue, typically in the emergency room setting. (Tr. at 29-30) (see also Tr. at 925, 972, 700, 1000, 1026, 1040, 1055, 1621). On each occasion, she was given a "migraine cocktail" and discharged. (Tr. at 29-30, 700, 972, 1000, 1026, 1040, 1054-55, 1626.)

Upon referral to a neurologist in March 2020, Plaintiff reported that she had 23 migraines a month which could last "24-82 hours." (Tr. at 1363.) Plaintiff further indicated that she "never sleeps well," snores, and "wakes frequently." (Tr. at 1363.) She was previously diagnosed with sleep apnea, but was not in treatment for that condition. (Tr. at 1368.) The neurologist, Dr. Antonia Ahern, concluded that Plaintiff "needs to address sleep apnea and have that treated, then I can revisit headaches if necessary." (Tr. at 1368.) During a return visit to neurology in October 2020, the provider noted that Plaintiff had 92 percent compliance with CPAP usage over the preceding 90 days, and that using the CPAP machine had dramatically improved Plaintiff's headaches. (Tr. at 31, 1556.) In fact, Plaintiff endorsed only one headache per week. (Tr. at 31, 1556.) Although Plaintiff indicated that some of these

9

headaches were still of longer duration, she stated that they were considerably shortened when she took Excedrin Migraine near the time of onset. (Tr. at 31, 1556.)

Notably, a primary care treatment note dated April 23, 2021 reads as follows:

> Patient reports that she stopped taking all of her medications greater than 3 months ago, and is requesting refills of all of her regularly scheduled medications to get back on track. . . . Reports that she had tolerated all of her medications well, but that life got hectic and busy and she stopped taking them.

(Tr. at 1761.) Plaintiff reported at that time that she was "doing well" despite her lack of medications. (Tr. at 32, 1761.) However, at a follow-up primary care appointment in June 2021, Plaintiff indicated that she "had recently given up driving due to excessive sleepiness" (Tr. at 32, 1898), and she testified at the administrative hearing that she was no longer using a CPAP machine (Tr. at 145.) Moreover, Plaintiff was dismissed from her previous neurology practice on April 14, 2021 "due to several no-shows and last minute cancellations." (Tr. at 33, 1898.)

Overall, in finding Plaintiff less limited than alleged, the ALJ relied on Plaintiff's "conservative treatment history showing good control of [her] symptoms" when using medications and other treatments as prescribed. (Tr. at 29, 31, 33.) This is further developed by the ALJ's discussion of Plaintiff's treatment with medication (Tr. at 30-31), her significant improvement and reduction of headaches when using her CPAP machine (Tr. at 31, 1556), and her ability to manage the headaches with Excedrin (Tr. at 31, 1556), as of her October 2020 appointment with her neurologist (Tr. at 1556).[5] The ALJ also relied on the treatment

---

[5] That appointment note reflects that Plaintiff's neurologist expected that with continued use of the CPAP, her migraines may continue to improve, and advised her to take Excedrin as soon as she feels she is getting a migraine, and also noted the availability of other medications to address migraines as well. (Tr. at 1561.)

records and examinations, specifically "physical examinations generally showing no significant neurological defects," (Tr. at 29-30), and the ALJ also noted Plaintiff's failure to follow up and seek further treatment such that she was dismissed from the neurology practice in April 2021 "due to several no-shows and last minute cancellations." (Tr. at 32-33.) In the briefing, Plaintiff cites to the medical treatment records, but consistent with the ALJ's analysis, these records appear to reflect only one medical visit involving treatment for headaches after October 2020, specifically when Plaintiff sought treatment in June 2021 for swelling and falling asleep while driving, and received a Kenalog injection for her headache. (Tr. at 32-33, 1895, 1904.)[6] The ALJ also relied on Plaintiff's "extensive activities of daily living." (Tr. at 33), as well as the prior decision dated June 29, 2019, denying Plaintiff's previous claim for disability (Tr. at 34, 164). The ALJ also relied on the opinions of the state agency consultants, including Dr. Celeste Williams, who found that Plaintiff's migraines were a severe impairment sufficiently addressed by an exertional limitation to light work with postural limitations and a limitation to no concentrated exposure to hazards such as machinery or heights. (Tr. at 189-91.) In addition, the ALJ specifically noted that Plaintiff's time off-task as a result of her symptoms "would be accommodated by the performance of simple, routine, repetitive tasks." (Tr. at 28.) Plaintiff, who bears the burden of proving disability, presents no evidence that her headaches would cause any specific work limitations. Even Plaintiff's own testimony does not address or raise any limitations as a result of her migraines, and none of Plaintiff's providers

---

[6] After the hearing, Plaintiff submitted additional medical records reflecting her treatment during 2021, none of which included complaints or treatment for headaches. These records also reflect that in October 2021, Plaintiff reported to her doctor that she had a problem of methamphetamine abuse and was seeking "help to get into rehab for methamphetamine abuse." (Tr. at 2073.)

11

or other medical sources opined that Plaintiff's headaches caused any limitations at all during the time period in question.

As a final matter, Plaintiff cites the Fourth Circuit's recent decision in Oakes v. Kijakazi, 70 F.4th 207, 215 (4th Cir. 2023), for the proposition that "a claimant is entitled to rely exclusively on subjective evidence to prove the severity of their symptoms." (Pl.'s Br. at 10-11 (quoting Hines, 453 F.3d at 565 and citing Oakes, 70 F.4th at 215).) Plaintiff stresses that the Fourth Circuit remanded in Oakes "because the ALJ 'never addressed the fact that disability benefits can be awarded on the sole basis of an objective impairment and derivative subjective pain[,]' and further explanation was needed." (Pl.'s Br. at 11 (quoting Oakes, 70 F.4th at 215-16).) However, in the present case, the ALJ did not rely upon the absence of objective evidence alone to discount Plaintiff's symptoms. Rather, the ALJ cited Plaintiff's conservative treatment, her symptomatic improvement when compliant with treatment, and her continuing ability to perform a variety of daily activities. (Tr. at 29, 31, 33, 35.) As set out above, the ALJ specifically noted Plaintiff's conservative treatment history with good control with medications when she complied with the CPAP usage, as well as her physical examinations and treatment record, including the lack of follow-up with the neurologist. (See also Tr. at 29, 31, 33.) Accordingly, this is not a scenario in which the ALJ failed "to assess [the] claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam)). Here, the ALJ included Plaintiff's migraines among her severe impairments, crafted the RFC to account for her credibly established limitations, and explained

12

the omission of additional limitations in accordance with the regulations and relevant case law, including Arakas. Substantial evidence therefore supports this ALJ's determination.

B. Handling and Fingering

Plaintiff next contends that the ALJ erred by failing to perform a function-by-function evaluation of evidence relating to Plaintiff's ability to handle and finger with her left hand, despite evidence suggesting greater limitations. As Social Security Ruling ("SSR") 96-8p instructs, "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis," including the functions listed in the regulations. Social Security Ruling 96-8p: Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184, at *1 (July 2, 1996). "Only after such a function-by-function analysis may an ALJ express RFC in terms of the exertional levels of work." Monroe v. Colvin, 826 F.3d 176, 187 (4th Cir. 2016) (internal quotations and citations omitted). Further, the "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7. An ALJ must "both identify evidence that supports his conclusion and build an accurate and logical bridge from [that] evidence to his conclusion." Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (emphasis omitted).

The Fourth Circuit has noted that a *per se* rule requiring remand when the ALJ does not perform an explicit function-by-function analysis "is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are 'irrelevant or

Case 1:23-cv-00308-JEP   Document 14   Filed 09/30/24   Page 13 of 19

uncontested.'" Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). Rather, remand may be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Mascio, 780 F.3d at 636 (quoting Cichocki, 729 F.3d at 177). The court in Mascio concluded that remand was appropriate because it was "left to guess about how the ALJ arrived at his conclusions on [the claimant's] ability to perform relevant functions" because the ALJ had "said nothing about [the claimant's] ability to perform them for a full workday," despite conflicting evidence as to the claimant's RFC that the ALJ did not address. Mascio, 780 F.3d at 637.

Here, as set out above, Plaintiff challenges the ALJ's analysis of evidence relating to Plaintiff's ability to handle and finger with her left upper extremity. At the administrative hearing, the following interchange took place between the ALJ and Plaintiff:

Q What symptoms are you having with your left arm?

A I have sharp pains in my left arm. It goes down to my shoulder blades down to my left arm and my fingertips.

Q Does it affect your hands?

A Yes, it does.

Q How—can you button a blouse?

A Yeah, I can button a blouse, but sometimes it will grab my hand. It's like a cramp and it twisted by hands back.

Q It twists your hands back?

A And I get bad cramps. When I get the cramps, it kind of, you know, turns it the other way and it grabs my hands.

14

> Q   Are you able to hold one of those small, plastic water bottles in your left hand?
>
> A   No, but sometimes I can and sometimes I don't. I'll have a like a sharp pain in my left arm and it—I will give out on my hands. My hands will let it drop.

(Tr. at 122.)

By way of background, Plaintiff underwent two cervical surgeries prior to her alleged onset date: a C3-C6 anterior cervical discectomy and fusion in 2014 and a revision of that procedure in May 2019. (Tr. at 30, 721, 1172.) She reported improvement following her surgeries, including improvement in pain radiating down her left arm. (Tr. at 1013, 1109, 1142.) Nevertheless, as Plaintiff correctly notes, treatment notes from the relevant time period reflect that, at times, she continued to exhibit mildly reduced grip strength upon examination, estimated as 4 or 4+ out of 5. (Tr. at 1013, 1109, 1142, 1703.) At other examinations, Plaintiff was noted to have full (5/5) grip strength. (Tr. at 1428, 1516, 1560.) Plaintiff also consistently demonstrated intact sensation during her examinations, despite subjective reports of tingling and loss of sensation. (Tr. at 977, 1013, 1109, 1142, 1516, 1560, 1703, 2092.) The ALJ specifically considered Plaintiff's cervical spine issues and related imaging as it related to her "chronic neck pain with paresthesias in both arms" (Tr. at 31), and noted that an MRI in November 2020

> revealed no new abnormality compared to previous cervical MRI scans, with [Plaintiff] being status post C3-6 discectomy and fusion, with widely patent central canal at each level but uncovertebral spurring causing mild left foraminal narrowing at C4-5. Adjacent segment disease at the C6-7 level demonstrated a shallow bulge and uncovertebral disease on the left causing mild central canal and mild-to-moderate left foraminal narrowing.

(Tr. at 31.) Thus, the ALJ also relied on imaging reflecting that Plaintiff's cervical MRI and CT results generally remained consistent over time.

The ALJ further noted that, although Plaintiff was referred to the UNC OT Hand Center in August 2019 due to complaints of bilateral, radial-sided wrist pain, x-rays demonstrated only minimal arthritic changes. (Tr. at 30, 1069, 1075.) Plaintiff's provider recommended occupational therapy for thenar strengthening and supportive CMC splints for comfort. (Tr. at 30, 1069.) However, Plaintiff attended only two occupational therapy appointments. (Tr. at 1068, 1075.) As noted above in subsection A, Plaintiff also described doing well in April 2021 even after she stopped all treatment, including all medications. (Tr. at 32.)[7]

The ALJ also considered and found persuasive the opinions of the State agency medical consultants, who found that Plaintiff was capable of performing work at the light exertional level with additional postural limitations. (Tr. at 33.) In this regard, the State agency medical consultants at the initial and reconsideration levels, Drs. Celeste Williams and Stephanie Green, considered the entire record, including Plaintiff's surgical history, imaging results, and intermittent, mildly decreased grip strength, when rendering their medical opinions. (See Tr. at 219-26, 268-74.) Although Dr. Williams found that Plaintiff required limitations to light work and limitations in bilateral overhead reaching as a result of her cervical impairment, neither she nor Dr. Green opined that Plaintiff required <u>any</u> limitations in handling, fingering,

---

[7] As with Plaintiff's headache impairment, the ALJ sufficiently explained his reasons for deviating from Plaintiff's statements regarding the impact of her symptoms on her ability to work. As set out above, the ALJ reviewed the medical evidence, the opinion evidence, Plaintiff's testimony, and the record, and explained the analysis of Plaintiff's subjective complaints. The ALJ specifically noted that Plaintiff managed her cervical symptoms conservatively, with pain management including Tylenol, Flexeril, and gabapentin (Tr. at 30), that her physical examinations showed no significant neurological deficits, and that she showed good control of symptoms when using her medications as prescribed (Tr. at 33). The ALJ also relied upon the opinions of the State agency medical consultants, as further discussed herein.

16

or feeling with either upper extremity. (Tr. at 225, 269, 274.) The ALJ included the limitation to light work and Dr. Williams' recommended limitation to no more than frequent reaching overhead bilaterally to address Plaintiff's arm and neck impairment. (Tr. at 28, 225.) Plaintiff does not contest the ALJ's reliance on these findings, which represent the only medical opinions of record.

Moreover, the ALJ also explicitly relied on the prior ALJ decision, decided just one day prior to Plaintiff's alleged onset date. Specifically, on June 27, 2019, a different ALJ also considered Plaintiff's similar claims and determined that Plaintiff remained capable of a limited range of light work. (See Tr. at 161-73.) In that decision, the prior ALJ considered Plaintiff's "left hand numbness and tingling," and particularly treatment records reflecting on some occasions Plaintiff's reduced strength of "4/5", but with other records reflecting "5/5 strength", "suggesting that [Plaintiff's] strength ranged from slightly diminished at 4/5 to grossly intact at 5/5." (Tr. at 162.) The prior ALJ concluded that "there are a few episodes of arm or grip strength weakness, but these reports are offset by other reports of intact strength, and also reports of [Plaintiff's] activities of daily living that include dressing, housework, and cooking." (Tr. at 162.) The prior ALJ did not include any handling, fingering, or reaching limitations in the RFC.

Plaintiff's present claims allege an onset date beginning the day after that prior decision, on June 28, 2019, and in light of the prior decision, the ALJ in the present case therefore considered Albright v. Commissioner of Social Security Administration, 174 F.3d 473 (4th Cir. 1999) and Acquiescence Ruling ("AR") 00-1(4) when evaluating the prior determination. The ALJ found that:

17

> In connection with Albright, the undersigned gives the June 27, 2019 prior decision from ALJ Greenberg great weight. [Plaintiff's] alleged onset date is June 28, 2019, the day after ALJ Greenberg's decision, thus the previously adjudicated period is very close in time to the period being adjudicated in this claim. The ALJ's finding of a residual functional capacity limiting [Plaintiff] to light work activity with additional postural, environmental, and mental limitations is consistent with the overall conservative treatment record during the period at issue as described above, along with the claimant's reported extensive activities of daily living.

(Tr. at 34.) Plaintiff has not attempted to show any worsening or aggravation of this impairment since June 27, 2019, and as noted by the ALJ, the imaging of Plaintiff's cervical spine did not reveal any new abnormalities (Tr. at 31), and the records reflect conservative treatment since that time (Tr. at 29, 34). As noted above, Plaintiff elected not to complete occupational therapy or other treatment and was discharged by her neurologist due to "several no-shows and last minute cancellations." (Tr. at 32-33.)

In the circumstances, the Court can sufficiently trace the ALJ's reasoning regarding Plaintiff's cervical impairment, including objective testing, medical opinion evidence, the prior ALJ decision, and the treatment record, all of which provide substantial evidence to support his finding that Plaintiff did not require specific handling, fingering, or feeling limitations. Woods, 888 F.3d at 694. It is not the function of this Court to re-weigh the evidence or reconsider the ALJ's determinations if they are supported by substantial evidence. As noted above, "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). Thus, the issue before the Court is not whether a different fact-finder could have drawn a different conclusion, or even "whether [Plaintiff] is disabled," but rather, "whether the ALJ's finding that [Plaintiff] is not disabled is supported

18

by substantial evidence and was reached based upon a correct application of the relevant law." Craig, 76 F.3d at 589. Here, the ALJ reviewed the evidence and explained the reasons for his determination. Plaintiff has not identified any errors that require remand, and Plaintiff's Motion to Reverse the Decision of the Commissioner will therefore be denied.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is AFFIRMED, that Plaintiff's Dispositive Brief [Doc. #12] is DENIED, that Defendant's Dispositive Brief [Doc. #13] is GRANTED, and that this action is DISMISSED with prejudice.

This, the 30th day of September, 2024.

/s/ Joi Elizabeth Peake
Joi Elizabeth Peake
United States Magistrate Judge